## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHRONIC DISEASE FUND, INC.<br>900 North Dallas Parkway<br>Suite 200<br>Plano, Texas 75024 | Civil Action No. _____ |
| Petitioner, | |
| --against-- | |
| UNITED STATES OF AMERICA | |
| Respondent. | |

### PETITION TO QUASH IRS SUMMONS ISSUED TO THIRD PARTY
### BIOGEN IDEC, INC.

Petitioner, Chronic Disease Fund d/b/a Good Days ("CDF"), located at 900 North

Dallas Parkway in Plano, Texas, by and through its attorneys, petitions the United States

District Court for the District of Columbia, pursuant to 26 U.S.C. §7609(b)(2), to quash the

third party record keeper summons ("Summons") issued on or around February 8, 2017 by the

Internal Revenue Service ("IRS") upon Biogen Idec, Inc. ("Biogen"), seeking records and

testimony related to CDF, and issued by Cathy C. Tai, who is known to be a Revenue Agent

under employment of the Respondent and located at 915 Second Ave., M/S W540 (Tai),

Seattle, WA 98174.

### JURISDICTION AND VENUE

1.     This Court has jurisdiction in this action pursuant to the provisions of Title 26

U.S.C. §§ 7609(b)(2)(A) and 7609(h), and Title 28 U.S.C. §§ 1331 and 1340.

2.      Venue is proper pursuant to 26 U.S.C. § 7609(h)(1) in that the person to whom the summons is directed is located within the geographic jurisdiction of this Court, with its office at 601 Pennsylvania Ave., NW, Suite 720, Washington, DC 20004.

**PARTIES**

3.      Petitioner CDF is a New Jersey non-profit corporation recognized by the IRS as an organization exempt from federal tax on related income as defined under 26 U.S.C. § 501(c)(3).  CDF's legal residence is in Plano, Texas at 6900 North Dallas Parkway in Plano, Texas.  CDF is a patient assistance charity providing charitable support to financially needy individuals who have been diagnosed with a chronic medical condition and who are unable to afford their co-pay portion of the bill (*i.e.*, the part that their insurance does not cover) for the medicine that has been prescribed by their doctors to treat their condition.  Many of the medications prescribed to treat chronic conditions are expensive specialty medications with no generic equivalent.  In addition, CDF provides medical travel support to low-to-moderate income chronically ill individuals, thereby enabling these individuals to obtain, and stay on, life-sustaining medical treatments.

4.      Respondent is the United States of America acting by and through its administrative agency the IRS.  The IRS is a federal government entity with agencies and offices throughout the country and within this district.  The IRS Agent who issued the summons is Cathy C. Tai, located at 915 Second Ave., M/S W540 (Tai), Seattle, WA 98174.

5.      The summoned person is Biogen, which is a biotechnology corporation located at 225 Binney Street, Cambridge, MA 02142.

## PETITION TO QUASH SUMMONS

6.      On or about February 8, 2017, Revenue Agent Tai issued a third party summons to Biogen. A copy of the Summons and its related attachments are attached hereto as Exhibit A. Notice of the Summons issued to Biogen was mailed to CDF via certified mail on February 21, 2017. A copy of the envelope containing the postmark of the Biogen Summons and a copy a print out of the United States Postal Service webpage providing the history of the certified notice are attached as Exhibit B.[1] The Summons directed to Biogen states that it is "In the Matter of Chronic Disease Fund, Inc. (EIN: 61-1462062)" and seeks records and testimony for the period of "January 1, 2011 through December 31, 2011." *See* Ex. A.

7.      The Summons provides that Biogen is to appear before Revenue Agent Tai at the IRS's offices on March 17, 2017. The Summons requests that Biogen provide documentation and information related to twelve broad categories, some of which are directly related to its activities as a donor to CDF. Pursuant to the Summons, Biogen is asked to:

       a)      "Provide copies of all Donation Agreements and all addenda or other agreements between Biogen Idec, Inc. ('Biogen') and Chronic Disease Fund ('CDF'), that were entered into and/or in effect during the tax year ending December 31, 2011;"

       b)      "With respect to each Donation Agreement, addendum, or other agreement referred to above, provide any and all documents that reflect the amounts donated by Biogen to CDF in 2011 with respect to each Donor Agreement, addendum, or other agreement, and the dates on which those donations were made;"

---

[1] CDF received two notices of summons from the IRS on February 27, 2017, and is unsure which summons related to which envelope. Thus, CDF has attached copies of both envelopes and online printouts of the tracking history of both envelopes as Exhibit B.

c)      "If Biogen made any donations to CDF that were not in connection with a Donation Agreement, addendum, or other agreement in 2011, provide any and all documents that reflect the amounts donated and the dates on which those donations were made;"

d)      "Provide all correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, between Biogen and CDF relating to donations between November 2010 and December 2011, including but not limited to, relating to the decision to provide donations for a particular disease state or pharmaceutical product, the amount of donations to be provided with respect to that disease state or pharmaceutical product, and the publicity and advertising to be undertaken with respect to that disease state or pharmaceutical product:"

e)      "Provide all internal correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, among employees of Biogen relating to donations to CDF between November 2010 and December 2011, including but not limited to, relating to the decision to provide donations for a particular disease state or pharmaceutical product, the amount of donations to be provided with respect to that disease state or pharmaceutical product, and the publicity and advertising to be undertaken with respect to that disease state or pharmaceutical product;"

f)      "Provide all documents provided by CDF to Biogen pursuant to Section 5, Data Collection and Reporting, of each Donation Agreement in effect in 2011. (sample Donation Agreement attached);"

4

g)      "Provide all documents provided by CDF to Biogen with respect to any and all annual audits of CDF as required by Section 6, Recordkeeping and Audits, of each Donation Agreement in effect in 2011.  This includes, but is not limited to, all correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, between CDF and Biogen with respect to any such audit. (sample Donation Agreement attached);"

h)      "Provide all documents that indicate the market share, measured by value, held by Biogen for each non-generic drug manufactured by Biogen that was used to treat each disease state for which Biogen provided donations to CDF in 2011;"

i)      "Provide all documents relating to the termination of any Donation Agreements between Biogen and CDF in 2011, including but not limited to all correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, between Biogen and CDF, among Biogen employees, and between Biogen and any physicians, pharmacies, hospitals, or physician practices:"

j)      "Provide all correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, between Biogen and any physicians, pharmacies, hospitals, or physician practices in 2011 relating to any drugs used to treat disease states for which Biogen made donations to CDF in 2011;"

k)      "For each disease state for which Biogen made a donation to CDF in 2011, provide all documents that identify any and all drugs available in the United States in 2011 to treat such disease state, including the name and manufacturer of each such drug, and the market share held by each manufacturer of such drug;" and

5

l)      "With respect to each Donation Agreement in effect during 2011 between Biogen and CDF, provide all documents that reflect any statistics maintained by Biogen in 2011 to enable it to analyze the cost/benefit to providing donations to CDF, and provide all analyses Biogen made using such statistics.  Provide all correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, between Biogen and CDF in 2011 relating to such statistics and analyses, and all internal correspondence in any form, including but not limited to, paper and electronic and any documents memorializing conversations, among Biogen employees relating to such statistics and analyses."

8.      The IRS must at all times use the summons authority in good-faith pursuit of a congressionally authorized purpose. The IRS has the burden of showing in an adversarial proceeding that its investigation is pursuant to a legitimate purpose, and that the information sought is relevant and material to this legitimate purpose.  Good faith is not presumed where the summons power is used to harass or to pressure the individual.

9.      This petition is based on CDF's contentions that:

a)      A substantial portion of the information that the IRS seeks with the Summons is overbroad and not relevant to any legitimate purpose.  None of the internal information, documentation, or communications related to Biogen's business activities is either material or relevant to the IRS examination of CDF's 2011 Form 990 because internal communications and information seen exclusively by third parties would not shed light on the relevant factual issue, CDF's purpose in operating its co-pay assistance program.

b)      The IRS already possesses the documents that do concern CDF, as CDF

has previously provided the IRS with a substantial portion of the information requested.

Therefore, the IRS cannot demonstrate that all of the arguably relevant information that

the summons seeks from Biogen is not within the possession of the IRS.

## STATEMENT OF FACTS

10.     CDF is a New Jersey non-profit corporation recognized by the IRS as an

organization exempt from federal tax on related income as defined under 26 U.S.C. § 501(c)(3).

11.     In furtherance of its charitable mission of serving individuals suffering from

chronic and terminal diseases, CDF provides co-pay, medical travel, and healthcare maintenance

support to low-income chronically ill Americans, thereby enabling these individuals to obtain

life-sustaining drugs they could not otherwise afford.  CDF's programs are established around

disease state categories approved by the CDF Board, each member of which is fully independent

of CDF's pharmaceutical donors.  Since 2003, CDF's efforts have resulted in the provision of

financial assistance to more than 500,000 patients and the direct payment of more than $1 billion

for the life-sustaining medication needed by individuals who may have otherwise been unable to

afford such medication.

12.     CDF operates its charitable co-pay assistance program in accordance with the

guidelines adopted by the U.S. Department of Health and Human Services ("HHS"), Office of

the Inspector General ("OIG") for independent charity patient assistance programs ("OIG

Guidance").  *See* HHS OIG Special Advisory Bulletin on Patient Assistance Programs for Part D

Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), attached hereto as Exhibit C, and HHS OIG

Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79

Fed. Reg. 31120 (May 30, 2014), attached hereto as Exhibit D.

13.     The purpose of the OIG Guidance is to ensure that the CDF co-pay assistance

program, like similar programs operated by other charities, is operated solely for the purpose of serving the needs of individuals suffering from chronic and terminal disease while maintaining its independence from the influence or control of the private interests of the drug manufacturers. At all times since the creation of its co-pay assistance program, CDF has operated under favorable advisory opinions from the OIG regarding CDF's operation of its patient assistance program ("OIG Advisory Opinions"). OIG Advisory Opinion No. 06-10, issued on September 14, 2006, is attached hereto as Exhibit E, and OIG Advisory Opinion No. 09-04, issued on May 11, 2009, is attached hereto as Exhibit F.

14.     All of the safeguards that the OIG requires with respect to a drug manufacturer's donations to CDF require that CDF neither "function as a conduit for payments by the pharmaceutical manufacturer to patients," nor "impermissibly influence beneficiaries' drug choices." Ex. C, HHS OIG Special Advisory Bulletin, at 70627. Specifically, the required independence is accomplished in the following ways:

a)     No drug manufacturer or any of its affiliates can exert any direct or indirect influence or control over the charity or its assistance program.

b)     The charity must award assistance in an independent manner that severs any link between a drug manufacturer's funding and the beneficiaries who ultimately receive such funding.

c)     The charity must award assistance without regard to the following: (i) any drug manufacturer's interests, and (ii) the beneficiary's choice of product, provider, practitioner, supplier, or insurance plan (including Medicare Part D plan).

d)     The charity must provide assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner.

e)      Drug manufacturers cannot solicit or receive data that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.

f)      Drug manufacturers cannot influence, directly or indirectly, the identification of disease or illness categories that a charity supports, which must be defined in accordance with widely recognized clinical standards, in a manner that covers a broad spectrum of available products, and without reference to specific symptoms, severity of symptoms, or the method of administration of drugs.

*Id.* at 70626-27.

15.     HHS has determined that where charities such as CDF operate in a manner consistent with the OIG Advisory Opinions, "[l]ong-standing OIG guidance makes clear that pharmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, bona fide charitable assistance programs." *Id.* at 70626.

16.     To this end, no pharmaceutical manufacturer, including Biogen, has the ability to select or influence the diseases or drugs covered by the CDF co-pay assistance program, influence the types of drugs covered by CDF, or obtain data or documentation that would facilitate the correlation of the number of subsidized prescriptions with the amount of the pharmaceutical manufacturer's donations. Efforts to obtain such data or exert such influence would violate the OIG Guidance and possibly the anti-kickback statutes.

17.     During the 2011 calendar year, CDF assisted 80,520 individuals suffering from terminal or chronic diseases, providing $195,166,608 in charitable assistance to persons in need of life-sustaining drugs and related support, an amount in excess of 92% of CDF's total revenue.

18.     Pursuant to its audited financial statements, in 2011, the co-pay assistance

program equaled approximately 96% of all CDF expenses, not including overhead expenses such as payroll (approximately 1.3% of total expenses) or fundraising (approximately 1.7% of total expenses).

19.    By a letter dated March 14, 2014, CDF was informed that the IRS was going to examine CDF's activities during the tax year that ended on December 31, 2011.  As an attachment to the March 14, 2014 letter, the IRS included an Information Document Request ("IDR"), which requested a substantial amount of information related to CDF's operations, including but not limited to:

       a)    All corporate bookkeeping records and other financial records, which included "[b]ank/brokerage/other third party financial institution statements from December 1, 2012 to January 31, 2012;"

       b)    A statement of income and expenses for the year under examination;

       c)    A copy of all reports from independent auditors for the year under examination;

       d)    A description of "any transactions related to cash donation from pharmaceutical companies in which [CDF was] involved;" and

       e)    An electronic copy of CDF's QuickBooks books and records for the tax year ending 12.31.2011."

20.    CDF provided a substantial amount of information to the IRS in response to the IDR.  Examples of information provided by CDF in response to the IDR included:

       a)    All available corporate bookkeeping records and other financial records, including copies of "[b]ank/brokerage/other third party financial institution statements from December 1, 2012 to January 31, 2012;"

b)      A statement of income and expenses for the year under examination;

c)      A copy of all reports from independent auditors for the year under examination;

d)      An explanation from independent auditors of all transactions related to cash donations; and

e)      An electronic copy of CDF's QuickBooks for the tax year ending on December 31, 2011.

CDF also provided information specific to the donations that it received from pharmaceutical companies, including Biogen. For example, along with other comprehensive financial and banking records requested by the IRS, CDF provided a spreadsheet listing donors and the amount of all donations received, organized according to each disease state supported by CDF during 2011. *See* Declaration of Matthew T. Journy in Support of Petition to Quash IRS Summons Issued to Third Party Biogen Idec, Inc., dated March 13, 2017, and filed concurrently herewith ("Journy Decl.").

21.     On October 15, 2015, CDF had a meeting with the IRS during which the IRS verbally informed CDF that the only unresolved issue in the case was whether CDF's co-pay assistance program accomplished a charitable mission or whether it conferred an impermissible benefit on the private pharmaceutical companies whose drugs were purchased through CDF's co-pay assistance program.

22.     The IRS recognized that if the CDF co-pay assistance program, which was operated in accordance with all applicable OIG Guidelines, conferred an impermissible private benefit, then any organization providing co-pay assistance would be precluded from being recognized as exempt from federal income tax under 26 U.S.C. 501(c)(3). Moreover, as the OIG

Guidance provides that only organizations exempt from tax under 26 U.S.C. § 501(c)(3) are permitted to provide co-pay assistance programs, the Service recognized that such a determination would effectively eliminate the availability of such programs. As such, at its October 15, 2015 meeting with CDF the IRS asked CDF to submit a request for technical advice on the issue of whether the administration of a co-pay assistance program accomplishes a charitable mission or whether such a program confers an impermissible private benefit on the private pharmaceutical companies who provide the charitable donations necessary for CDF to administer such a program.

23.     CDF submitted its request for technical advice regarding whether the administration of a co-pay assistance program in accordance and compliance with all OIG Guidance and OIG Advisory Opinions was an activity which accomplished a charitable mission or whether such activities conferred an impermissible private benefit on the pharmaceutical manufacturers.

24.     On January 25, 2017, Revenue Agent Tai left a message for CDF's legal counsel informing CDF that the IRS had made contact with third parties seeking additional information about the CDF co-pay assistance program.

25.     In a telephone conversation on January 27, 2017, Revenue Agent Tai explained that CDF's request for a technical advice memorandum, including a memo providing the IRS position on the issue, had been submitted to the IRS National Office. However, after reviewing the information, the IRS National Office informed Revenue Agent Tai that there was insufficient information in the administrative record to support the IRS position regarding private benefit. As such, the IRS decided to develop such additional information by obtaining the information from third parties, specifically, the pharmaceutical company donors to CDF, such as Biogen.

26.     On January 31, February 2, February 3, and February 21, 2017, CDF received

notice of summonses issued to Novartis Pharmaceuticals Corporation, Genentech, Inc., Johnson & Johnson, and Bayer HealthCare Pharmaceuticals, respectively. On February 27, 2017, CDF received notice of the Summons to Biogen and notice of an additional summons to Teva Neuroscience, Inc., which are virtually identical to the four earlier summonses.

27. On Monday, February 6, 2017, CDF's legal counsel had a conference call with Revenue Agent Tai and her Group Manager, Mark Costa. During the call, CDF's legal counsel informed the IRS that the request was overly broad and was not relevant to a legitimate purpose. CDF also informed the IRS that such direct contact with the CDF donors would likely have a devastating impact on CDF because it would raise unnecessary concerns as to whether CDF was properly engaged in charitable activities. To assist the IRS in its collection of information and to protect itself from the potential devastation of the IRS's direct contact with donors through the issuance of third-party summonses, CDF offered to assist the IRS in its collection of all information relevant to the IRS exam of CDF by reaching out to the necessary third parties itself if the IRS agreed to stop contacting third parties directly and to withdraw the summonses already issued.

28. On Wednesday, February 8, 2017, the Service informed CDF's legal counsel that it would not be withdrawing the summonses issued and that if CDF intended to stop such actions by the IRS, then CDF would have to file a motion to quash the summonses that the IRS had already issued.

**ARGUMENT**

## I.   LEGAL STANDARD

Pursuant to 26 U.S.C. § 7602(a)(1), the IRS has the authority "[t]o examine any books, papers, records, or other data which may be relevant or material" to "determining the liability of any person for any internal revenue tax." Additionally, section 7602(a)(2) gives the IRS the authority to summon any person having books of account "relevant or material to such inquiry."

Courts have long recognized that 26 U.S.C. § 7602 "reflects a congressional policy *favoring disclosure* of all information relevant to a legitimate IRS inquiry." *United States v. Arthur Young & Co.*, 465 U.S. 805, 806 (1984) (emphasis in original). As such, courts have interpreted the authority conferred on the IRS by section 7602 to be very broad, noting that "[a]lthough such investigations unquestionably involve some invasion of privacy, they are essential to our self-reporting system." *United States v. Bisceglia*, 420 U.S. 141, 146 (1975). However, "the Government may not exercise its investigative and inquisitorial power without limit—the examination is 'unreasonable' and impermissible if it is overbroad." *United States v. Harrington*, 388 F.2d 520, 523 (2d Cir. 1968); *United States v. Coopers & Lybrand*, 550 F.2d 615, 619 (10th Cir. 1977) (noting that "the investigative powers of § 7602 are not without limitation").

The case that most clearly sets the limits on the authority of the IRS to issue and enforce summonses is *United States v. Powell*, 379 U.S. 48 (1964). In *Powell*, the Supreme Court established the "*Powell* factors," which are the necessary prerequisites for establishing a prima facie case validating the summons. The "*Powell* factors" are: (1) the investigation has a legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the information sought is not already in the IRS's possession, and (4) the IRS followed all requisite administrative steps (*i.e.*,

providing notice to the taxpayer and setting the appearance date the requisite 23 days after the notice date). *Id.* at 58-59. This showing is decidedly minimal, as the Supreme Court has stated that the IRS can "obtain items of even potential relevance to an ongoing investigation," and information is relevant if it "might throw light" on the correctness of a return. *Arthur Young*, 465 U.S.at 813 n.11 & 814. Here, the IRS cannot satisfy the second or third of the *Powell* factors.

In the present case, CDF recognizes that the IRS examination of CDF's 2011 tax year has a legitimate purpose and that the IRS followed all requisite administrative steps necessary to issue a summons. However, a significant portion of the information sought by the Summons is not relevant to the IRS's legitimate investigation of CDF, and additional information has previously been provided to the IRS during the course of the CDF examination and, as such, is within the Service's possession.

Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose." *Coopers & Lybrand*, 550 F.2d at 620. "This judicial protection against a sweeping or irrelevant order is particularly appropriate in matters where the demand for records is directed not to the taxpayer but to a third-party who may have had some dealing with the person under investigation." *Harrington*, 388 F.2d at 523; *Coopers & Lybrand*, 550 F.2d at 621 (same). In determining whether an inquiry is relevant to a legitimate purpose, the courts have noted that the IRS "is not to be given unrestricted license to rummage through the office files of an accountant in the hope of perchance discovering information that would result in increased tax liabilities for some yet unidentified client. Section 7602 summonses were not meant to give the IRS such investigative and inquisitorial power." *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973); *United States v. Dauphin Deposit*

*Trust Co.*, 385 F.2d 129, 131 (3d Cir. 1967) ("[t]he Government is not entitled to go on a fishing

expedition through [the taxpayer's records]"); *United States v. Richards*, 631 F.2d 341, 345 (4th

Cir. 1980) ("a 'fishing expedition' through a taxpayers records exceeds the relevant scope of the

summons power"); *United States v. Matras*, 487 F.2d 1271, 1275 (8th Cir. 1973) ("the

government failed to sustain its burden of proof by alleging a general need for a 'road map'").

 Rather than conducting a fishing expedition, to demonstrate that a summons is relevant to

a legitimate purpose, the IRS must show that "the inspection sought 'might have thrown light

upon' the correctness of the taxpayer's return." *Foster v. United States*, 265 F.2d 183, 187 (2d

Cir. 1959) (citation omitted).  For purposes of determining what "might throw light upon the

correctness of the return," courts have looked to whether there is "an indication of a realistic

expectation rather than an idle hope that something may be discovered." *Harrington*, 388 F.2d at

524; *United States v. Egenberg*, 443 F.2d 512, 515 (3d Cir. 1971) (same); *Matras*, 487 F.2d at

1274 (same); *Richards*, 631 F.2d at 345 ("prior to judicial enforcement, the court must conclude

that there is a realistic expectation that the information called for by the summons will throw

light upon the [taxpayer's] federal tax liability").  Thus, if the IRS does not have a reasonable

expectation that the information requested in the summons will throw light upon CDF's federal

tax liability, then the summons will be overbroad and should be quashed.

 With respect to the third *Powell* factor, "[t]he obligation is upon the Commissioner to

demonstrate that the material requested is not within his possession or, that if it is technically

within his possession, he has no practical way of obtaining the desired item." *Theodore*, 479

F.2d at 755.  Therefore, to the extent that information sought by the Summons is within the

possession of the IRS, the Summons is not enforceable with respect to such information.

II.      **THE INQUIRY IS NOT RELEVANT TO THE INVESTIGATION**

A significant portion of the Summons is unenforceable because "it is overbroad [and] disproportionate to the ends sought," and a "rambling exploration" of third party Biogen's files. *Harrington*, 388 F.2d at 523.

The IRS is examining whether CDF continues to qualify as an organization exempt from federal income tax under 26 U.S.C. § 501(c)(3). Generally, for an organization to qualify for exemption, it must satisfy the operational test, meaning that it "must engage primarily in activities which accomplish one or more exempt purposes specified in section 501(c)(3)." *Nationalist Movement v. Comm'r*, 37 F.3d 216, 219-20 (5th Cir. 1994) (citation omitted). "Under the operational test the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization." *B.S.W. Group, Inc. v. Comm'r*, 70 T.C. 352, 357 (1978) (further explaining that the "critical inquiry is whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose"). Therefore, the aim of the IRS's investigation is to determine the purpose for which CDF operates its co-pay assistance program.

CDF seeks to quash five out of twelve requests that, by their nature, are overly broad and irrelevant because they cannot possibly throw light on CDF's own charitable purpose or intent. Rather, these five requests seek: (1) Biogen's own CDF-related "internal correspondence," which CDF has never seen; (2) Biogen's correspondence with physicians, pharmacies, hospitals, or physician practices "relating to any drugs used to treat disease states for which" Biogen donated to CDF in 2011, *i.e.* overbroad correspondence limited to parties wholly external to CDF; (3) documents concerning the market share of each Biogen non-generic drug that was used to treat each disease state for which Biogen donated to CDF in 2011; (4) documents identifying

"any and all drugs" available in the United States to treat each disease state for which Biogen made a donation to CDF in 2011, plus each manufacturer's market share; and (5) documents showing any statistics or analyses by Biogen to conduct a cost/benefit analysis of donating to CDF, in 2011.

In *Presbyterian & Reformed Publ'g Co. v. Comm'r of Internal Revenue*, 743 F.2d 148 (3d Cir. 1984), the Third Circuit observed that it is never a straightforward task to determine the "purpose" of an organization or corporate entity. *Id.* at 155. The Third Circuit noted that while "purpose" within the meaning of section 501(c)(3) appeared to refer to the taxpayer's "subjective intent," in the case of an organization courts look to "objective indicia from which the intent of the actor may be discerned." *Id.*[2]

Here, the five requests at issue seek documents that have no bearing on, and can give no indication of, CDF's subjective intent. Two of the requests ask Biogen to produce communications to which CDF was never a party. Not only is such information unable to shed any light on CDF's purpose in operating a charity pursuant to 26 U.S.C. § 501(c)(3), but such a production is potentially enormously burdensome on Biogen. In particular, by asking for Biogen's third-party communications "relating to any drugs" with tangential, if any, connection to CDF, the IRS seeks to employ grossly overbroad and disproportionate discovery tactics, which are out of bounds even under the permissive standard of 26 U.S.C. § 7602(a)(1). Similarly, the three other requests concerning analyses internal to Biogen, or market share data

---

[2] Indeed, it is well-established that a donor may have a private motivation to make donations, and derive a private benefit therefrom, that is entirely separate and distinct from the intent of the charitable organization to which the donor gives. Nevertheless, it is the charitable organization's intent, not the donor's intent, that counts in determining the organization's section 501(c)(3) "purpose." *See, e.g.*, Rev. Rul. 70-186, 1970-1 C.B. 128 ("Any private benefits derived by the [donor] lake front property owners do not lessen the public benefits flowing from the [charitable] organization's operations" to improve the condition of the lake).

for "any and all drugs" in the United States with doubtful connection to CDF, are vastly out of proportion to the IRS's aim in investigating CDF's charitable purpose.

The undersigned counsel for CDF has not been able to find any legal support for the contention that correspondence or analyses *wholly external to the charitable organization* are a permissible or relevant source of discovery about the organization's "purpose" pursuant to 26 U.S.C. § 501(c)(3). This is particularly the case where CDF is already subject to substantial and highly specific regulation by HHS, which ensures CDF's independence from external pharmaceutical donors for the purpose of the Federal anti-kickback statute.

HHS has devoted substantial resources over many years to the regulation of charitable organizations like CDF, which HHS categorizes as a patient assistance program ("PAP"). As noted above, in 2005, HHS issued an analysis on PAPs, noting that it "believed lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D [Medicare] beneficiaries can afford medically necessary drugs." Ex. C, HHS OIG Special Advisory Bulletin, at 70624. HHS explained that "*bona fide* independent charities may reasonably focus their efforts on patients with particular diseases (such as cancer or diabetes) and that, in general, the fact that a pharmaceutical manufacturer's donations to an independent charity as earmarked for one or more broad disease funds should not significantly raise the risk of abuse." *Id.* at 70627.

Since 2005, HHS has continued to review this space to ensure that charities in fact remain independent. In the 2014 HHS OIG Supplemental Special Advisory Bulletin, HHS noted that it had continued to investigate PAPs and had consequently gained "experience . . . in the intervening years," and it "continue[d] to believe that properly structured PAPs can help Federal health care program beneficiaries." Ex. C, at 31120. HHS noted that "PAPs have long provided

important safety net assistance to [] patients, many of whom have chronic illnesses and high drug

costs." *Id.* Thus, in 2014, HHS concluded, again, that "properly structured, Independent Charity

PAPs provide a valuable resource to financially needy patients." *Id.* at 31123.

In the context of HHS's ongoing efforts to regulate PAPs, CDF specifically requested

advisory opinions from HHS to ensure that its donor arrangements complied with HHS

guidelines. Accordingly, the OIG has issued two advisory opinions to CDF, on September 14,

2006 and May 11, 2009, both stating the OIG's opinion that CDF's structure *"effectively*

*insulates beneficiary decision-making from information attributing the funding of their benefit to*

*any donor.*"[3] Ex. E, OIG Advisory Opinion No. 06-10, at 6-7; Ex. F, OIG Advisory Opinion No.

09-04, at 5-6 (emphasis added).

As stated in its May 11, 2009 opinion, the OIG reached its conclusion about CDF's

independence based on the observations that, *inter alia*: "no donor or affiliate of any donor exerts

direct or indirect control over [CDF] or its Funds"; CDF "maintains absolute, independent, and

autonomous discretion as to the use of donor contributions to the Funds"; CDF "awards

assistance in a truly independent manner that severs any link between donors and beneficiaries";

and CDF "does not provide donors with any data that allows a donor to correlate the amount or

frequency of its donations with the amount or frequency of the use of its products or services."

Ex. F, OIG Advisory Opinion No. 09-04, at 6.

The OIG concluded, CDF's "interposition as an independent charitable organization

between donors and patients and the design and administration of the Arrangement provide

---

[3] HHS's opinions were rendered pursuant to sections 1128A(a)(5), 1128A(a)(7), and 1128(b)(7) of the Social Security Act, as those sections relate to the commission of acts described in section 1128B(b) of the Act, the Federal anti-kickback statute. HHS's analysis of CDF's independence from pharmaceutical donors, as it relates to the anti-kickback statute, is directly relevant to CDF's *bona fide* independence from donors and charitable "purpose" pursuant to section 501(c)(3) of the Internal Revenue Code.

*sufficient insulation so [CDF's] assistance to patients should not be attributed to any of its donors.*" *Id.* at 7 (emphasis added).

In other words, HHS has carefully and thoroughly vetted this charitable space, and it has specifically analyzed CDF's own organization and operation as a charity. CDF has made every effort to seek guidance from HHS and the IRS and demonstrate its true independence from donors, including by producing reams of requested information. Given CDF's arrangement, the IRS's exceedingly burdensome requests to Biogen of external analyses and communications by donors is incommensurate with any legitimate investigative purpose.

In view of the extensive regulation to which CDF is already subjected, the IRS's apparent refusal to accept the overwhelming evidence of CDF's charitable purpose at face value, as well as its willingness to encumber third-party pharmaceutical donors with irrelevant and onerous requests, are especially troubling. In *Presbyterian & Reformed Publ'g*, the Third Circuit analyzed the "difficult and murky problems" presented when the IRS turns aside the charitable organization's explanation of its own purpose, and seeks evidence of what it considers the "true but unspoken motive" of the organization. 743 F.2d at 155. The court observed that "[d]espite the long history of § 501(c)(3) and the numerous organizations that have claimed its coverage, no regulation or body of case law has defined the concept of 'purpose' under this provision of the Tax Code with sufficient clarity to protect against arbitrary, ad hoc decision making." *Id.* at 156. Unfortunately, the current Summons by the IRS reflects how seemingly arbitrary and unbounded its investigation may become when it seeks exclusively external documents from third parties that can have no possible bearing on "the subjective intent of [CDF]," or on "objective indicia from which the intent of [CDF] may be discerned." *Id.* at 155.

21

CDF's motivations cannot be ascertained from correspondence or analyses it has never seen.  Not only has CDF never seen the documents the IRS requests, but CDF is thoroughly regulated by the relevant authority—HHS—to ensure its total independence from any such information.  In light of the strict regulatory space in which CDF operates, the challenged requests amount to a proscribed fishing expedition that exceeds even the considerable discovery powers of the IRS.

Therefore, the Summons should be quashed with respect to the following information and documentation requested:

a)      "Provide all internal correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, among employees of Biogen relating to donations to CDF between November 2010 and December 2011, including but not limited to, relating to the decision to provide donations for a particular disease state or pharmaceutical product, the amount of donations to be provided with respect to that disease state or pharmaceutical product, and the publicity and advertising to be undertaken with respect to that disease state or pharmaceutical product;"

b)      "Provide all documents that indicate the market share, measured by value, held by Biogen for each non-generic drug manufactured by Biogen that was used to treat each disease state for which Biogen provided donations to CDF in 2011;"

c)      "Provide all correspondence in any form, including but not limited to, paper and electronic and all documents memorializing conversations, between Biogen and any physicians, pharmacies, hospitals, or physician practices in 2011 relating to any drugs used to treat disease states for which Biogen made donations to CDF in 2011;"

   d)  "For each disease state for which Biogen made a donation to CDF in 2011,

provide all documents that identify any and all drugs available in the United States in

2011 to treat such disease state, including the name and manufacturer of each such drug,

and the market share held by each manufacturer of such drug;" and

   e)  "With respect to each Donation Agreement in effect during 2011 between

Biogen and CDF, provide all documents that reflect any statistics maintained by Biogen

in 2011 to enable it to analyze the cost/benefit to providing donations to CDF, and

provide all analyses Biogen made using such statistics."

## III. THE CDF-RELATED INFORMATION SOUGHT IS ALREADY IN THE IRS'S POSSESSION

  As set forth above, numerous requests concerning internal communications from third

parties are not relevant to the audit.  As such, those requests are overbroad.  To the extent the

Summons seeks arguably relevant information—such as communications to and from CDF—the

IRS examination of CDF's 2011 tax year has lasted almost three years, and in that time CDF has

provided a substantial amount of information to the IRS regarding its activities, including a

substantial amount of information that the Service has requested of Biogen in the Summons.

  During the course of the IRS examination, CDF has provided all available financial

information, including a complete electronic copy of its 2011 QuickBooks, copies of all of its

financial audits conducted by independent auditors, copies of all of the statements from all of its

bank and brokerage accounts, and a spreadsheet providing the amount and source of all

donations funding each disease state that was covered during 2011.  *See* Journy Decl.

  To the extent that the Summons requests information within the IRS's possession, the

Summons fails the third of the "*Powell* factors," and the Summons should be quashed with

respect to such requests for documentation and information.  Thus, the IRS's attempt to obtain

certain information from Biogen is inappropriate to the extent the information is already in the IRS's possession.  The Summons should be quashed with respect to the following Summons requests:

a)       "With respect to each Donation Agreement, addendum, or other agreement referred to above, provide any and all documents that reflect the amounts donated by Biogen to CDF in 2011 with respect to each Donor Agreement, addendum, or other agreement, and the dates on which those donations were made;"

b)       "If Biogen made any donations to CDF that were not in connection with a Donation Agreement, addendum, or other agreement in 2011, provide any and all documents that reflect the amounts donated and the dates on which those donations were made;" and

c)       "Provide all documents provided by CDF to Biogen with respect to any and all annual audits of CDF as required by Section 6, Recordkeeping and Audits, of each Donation Agreement in effect in 2011."

## IV.    THE IRS FAILED TO PROVIDE SUFFICIENT NOTICE OF THE SUMMONS TO CDF

Even though CDF is centrally implicated in the records sought by the IRS from Biogen, the IRS did not provide timely or sufficient notice to CDF of the Summons.  This insufficient notice provides further grounds to quash the Summons.

With respect to summonses issued to third-parties, 26 U.S.C. § 7609(a)(1) generally provides that with respect to any person (other than the person summoned) who is identified in the summons, 'notice shall be given to any person so identified within 3 days of the day on which such service is made, but no later than the 23rd day before the day fixed in the summons as the day upon which such records are to be examined."  Pursuant to 26 U.S.C. §

7609(a)(2), "[s]uch notice shall be sufficient if on or before the third day, such notice is . . . mailed by certified mail to the last known address of such person."

Here, the IRS failed to comply with the timeliness requirement of 26 U.S.C. § 7609(a)(1). The IRS purportedly issued the Summons to Biogen on February 8, 2017; however, the IRS did not place the Summons in the mail to provide notice to CDF until February 21, 2017. *See* Exs. A, B. The IRS mailed notice to CDF thirteen (13) days after it issued the Summons to Biogen, well beyond the three-day limit. Therefore, pursuant to 26 U.S.C. § 7609(a)(2), the notice provided to CDF is insufficient.

Insufficiency of notice may be grounds to quash a summons, particularly where faulty notice is one of the summons's multiple shortcomings, including overbreadth. *See Larson v. United States*, 92-2 USTC ¶ 50,367 (D. Mont. 1992). Thus, the IRS's late notice is yet another reason to grant the present Petition to Quash.

Despite the prejudice caused by the IRS's late filing, CDF nevertheless has timely filed this Petition to quash pursuant to 26 U.S.C. § 7609, which permits CDF to commence a quash proceeding within 20 days of being given notice of the Summons. The IRS placed the Summons in the mail to provide notice to CDF on February 21, 2017. *See* Ex. B. CDF did not receive notice of the Summons until some days after that, on February 27, 2017. CDF therefore has until 20 days after such notice to file this Petition to Quash (or until March 20, 2017), or, alternatively 20 days after the notice was mailed, plus 3 days for service by mail pursuant to Federal Rule of Civil Procedure 6(d) (or until March 16, 2017). The Petition is timely filed, and the IRS's untimely, insufficient notice to CDF provides further grounds to grant the Petition.

## CONCLUSION

The Summons that the IRS served on Biogen is a fishing expedition that exceeds the scope of the IRS's summons power.  A substantial portion of the information sought by the Summons is not relevant to a legitimate purpose, and the IRS is unable to demonstrate that much of the other information is not already within the possession of the IRS.  Therefore, the challenged portions of the Summons should be quashed as overbroad and disproportionate to the end sought.

**WHEREFORE**, Petitioner, by and through its attorneys, prays that the Summons be quashed and for all other just and proper relief to which it is entitled.

Dated: March 24, 2017

**VENABLE LLP**

By: _____

Benjamin E. Horowitz (DC Bar #1017262)
600 Massachusetts Ave., NW
Washington, DC 20001
Telephone:  (202) 344-4494
Facsimile:  (202) 344-8300
Email:  behorowitz@venable.com

*Attorneys for Petitioner*
*Chronic Disease Fund, Inc.*